J-S25001-25

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| KYLE T. LEE | : | |
| | : | |
| Appellant | : | No. 1298 EDA 2024 |

Appeal from the Judgment of Sentence Entered February 14, 2024
In the Court of Common Pleas of Philadelphia County Criminal Division at
No(s): CP-51-CR-0008699-2022


BEFORE: PANELLA, P.J.E., DUBOW, J., and BENDER, P.J.E.

MEMORANDUM BY PANELLA, P.J.E.: **FILED AUGUST 11, 2025**

Kyle T. Lee appeals from the judgment of sentence entered in the Court of Common Pleas of Philadelphia County, after he was convicted of simple assault and recklessly endangering another person ("REAP") at a non-jury trial. Lee challenges the sufficiency of the evidence, alleging the Commonwealth failed to disprove the self-defense justification he raised at trial, pursuant to 18 Pa.C.S.A. § 505. After careful consideration, we affirm.

On November 22, 2022, Lee was involved in an altercation with Widchard Faustin, the property manager of the residence Lee rented in Philadelphia, that culminated in Lee pointing a firearm at Faustin and threatening to shoot him. The trial court comprehensively summarized the evidence presented at trial as follows:

> [Lee] was arrested on November 22, 2022 and charged with aggravated assault [], possession of an instrument of crime [],

terroristic threats [], simple assault [], and [REAP].[1] [The court] held a bench trial on December 13, 2023.

At trial, [the court] heard testimony from the complaining witness, Widchard Faustin; Philadelphia Police Detectives Paul Sanchez and Adam O'Donnell; Philadelphia housing code inspector Anthony Williams and [Lee's] neighbor, Laura Carr, who each testified on [Lee's] behalf; and [Lee] himself. Faustin testified as follows: [Lee] had rented properties from Faustin for about ten years and had occasionally worked for him. On the afternoon of November 22, 2022, Faustin tried to enter the front door of a two-story house at 1114 West Tioga Street in Philadelphia []. According to Faustin, the front door was a common entrance for the house's two residential units; [Lee] lived in the second floor unit. [Lee] blocked Faustin's path by standing on the porch steps, told him that he could not enter, and ran into the house. [Lee] then emerged from the house with a handgun, racked the slide, pointed it at Faustin's head, and threatened to shoot him. Faustin ended the encounter by moving away from the house and calling the police.

Detective Sanchez testified that he executed a warrant for the house, retrieving a handgun and ammunition from a bedroom on the second floor. [Lee's] neighbor and block captain, Laura Carr, testified that she saw the beginning of the altercation between Faustin and [Lee], in which Faustin pushed [Lee] aside and entered the house. She believed that Faustin was the initial aggressor. She also testified that [Lee] had a reputation [for] nonviolence.

[Lee] testified that when he saw Faustin arrive at the house that day, he told him that he could not come in, because "last time he did come in there while I wasn't there, he unplugged everything. All my stuff ... in my refrigerator went bad." [N.T. Trial, 12/13/23, at 85.] He stood next to the open front door, and Faustin pushed him to the side, entered the house, left, and came back. [Lee] believed that Faustin owned a gun, although he did not see it that day and did not know whether Faustin was carrying it. [Lee] unholstered his own gun, which he was licensed to carry, pointed it at Faustin, and threatened to shoot him. [Lee] did not testify that he feared that Faustin would hurt him. (At the trial, [the

_____

1 18 Pa.C.S.A. §§ 2702(a)(1), 907(a), 2706(a)(1), 2701(a), 2705, respectively.

court] observed that Faustin was decades older and significantly smaller and more frail than [Lee].) In a recorded statement that he gave to police that day, [Lee] admitted that he had pointed the gun at Faustin. He did not say in that statement that he had feared that Faustin would harm him.

As set forth above, there was no dispute as to whether [Lee] pointed the gun at Faustin and threatened him; he admitted that he did so. In hot dispute, however, was the question of whether [Lee's] actions were justified under the law. This question centered on whether [Lee] was in possession of the entire house, or only of the second floor, and whether he had the right to exclude Faustin from the first floor. [The court] heard the following evidence on this point[.]

Faustin testified that his niece owned the house, but Faustin was "in charge" of it. [*Id.* at 31]. He also owned a property across the street. Faustin rented the second floor of the two-story structure to [Lee]; the first floor was "an apartment that I kept for my people and that's where my tools are, that's where I stay from time to time." [*Id.* at 18, 30.] Both floors of the house were accessed through the front door. Faustin testified that on the day of the incident, [Lee] told Faustin that he could not come in because "he has taken over the entire property. And I told him, you can't do that, because you live upstairs and I'm not going upstairs. I'm going downstairs to my part." [*Id.* at 19.] According to Faustin, the house was physically divided into two units before [Lee] moved in, with a door with a lock separating the first and second floors. Faustin testified that [Lee] did not have a lease, but that his rent receipts said "apartment upstairs." [*Id.* at 29.] Faustin did not produce these receipts.

Inspector Williams, of Philadelphia's Department of Licenses & Inspections ("L&I"), testified that the owner of the house had been fined seven times for code violations in 2022. On August 8, 2022—more than two months before the incident in this case—an inspector had visited the house and determined that it was in the process of being converted into more than one unit. There were no permits for this work. "As far as [L&I was] concerned," the house was a single-family dwelling. [*Id.* at 64.]

[Lee] testified that he had lived in the house for almost three years before the date of the incident. Initially, he stated, he was permitted to use both floors. One to two years before the incident,

however, Faustin told [Lee] that [Lee] would have to pay more rent if he wished to occupy the first floor. [Lee] refused to pay additional rent. At that point, [Lee] testified, Faustin had workers put up a wall and door that closed off the stairway to the second floor from the rest of the first floor. "He, basically, nailed that up, put a door up, and had me stuck up there" on the second floor. [*Id.* at 75.] Faustin also converted one of the upstairs closets into a makeshift kitchen. [Lee] acknowledged that as of the date of the incident, he was permitted to use the first floor only to access the second floor, not as a living space: "I was only living upstairs at the time because he tried to block me off." [*Id.* at 90.] "Nobody," he said, was using the first floor. [*Id.*]

[Lee] showed two videos of the interior of the house. In the first video, taken before he moved in, there was no barrier between the first floor and the stairway to the second floor. The second was taken years later, before the incident. It showed that a wall and door, with a lock, had been put up to separate the first floor from the second floor. [Lee] also introduced rent receipts from July 2020 and September 2021. The portions of the receipts that are filled out are ambiguous, but appear to indicate that [Lee] was renting "2 Rooms" at "1114 W. Tioga St." [Exhibit D5.] [Lee] testified that when Faustin locked him out of the first floor, [Lee] filed complaints with L&I, sought help from a tenants' rights organization, and began withholding rent. [Lee] did not testify that L&I, the tenants' rights organization, or any other authority told him that he could forcibly exclude Faustin from the house. Indeed, [Lee's] testimony suggested that he understood that Faustin could enter the house under some circumstances. "So, I'm like — and I went to tenant rights. I didn't have to let him inside my house without being present, especially if he's coming over there to work on something because I had to be there." [N.T. Trial, 12/13/23, at 85.]

At the close of the Commonwealth's case, [the court] granted [Lee's] motion for judgment of acquittal on the aggravated assault charge. After [Lee] rested, defense counsel argued that [Lee's] actions were justified defense of his home under 18 Pa. C.S.A. § 507, "Use of force for the protection of property." [*Id.* at 93-97.] Defense counsel also referred to 18 Pa. C.S.A. § 505, "Use of force in self-protection," but conceded that section 507 was "more relevant" to [Lee's] defense. [*Id.* at 99.]

Trial Court Opinion, 11/12/24, at 1-5 (citations to record, brackets, and unnecessary capitalization omitted). Following the close of evidence and argument by counsel, the trial court convicted Lee of simple assault and REAP. On February 14, 2024, the court imposed concurrent one-year sentences of non-reporting probation. That same day, Lee filed a post-sentence motion in arrest of judgment in which he challenged the sufficiency of the evidence offered by the Commonwealth to disprove his defense of property justification. *See* Post-Sentence Motion, 2/14/24, at ¶ 5. On April 12, 2024, the trial court held a hearing on Lee's post-sentence motion, which it denied that same day.

Lee filed a notice of appeal and a court-ordered concise statement of matters complained of on appeal, pursuant to Pa.R.A.P. 1925(b), on May 3, 2024 and June 20, 2024, respectively. On November 12, 2024, the trial court filed its opinion, pursuant to Pa.R.A.P. 1925(a), in which it concluded that Lee's "act of pointing a loaded firearm at another man's head was not a legally justified defense of [his] property" and that Lee did not pursue a self-defense justification at trial. Trial Court Opinion, 11/12/24, at 1, 9.

On appeal, Lee presents the following question for our review:

Was the evidence insufficient to convict Kyle Lee of assault crimes where Lee denied the complainant, the property manager of Lee's rental unit, entry into the property and Lee reasonably believed that the complainant was armed and would turn violent so he brandished his own firearm?

Appellant's Brief, at 2.[2]

Lee presents a challenge to the sufficiency of the evidence to sustain his convictions for simple assault and REAP based on the Commonwealth's alleged failure to disprove his self-defense justification at trial.

> Because a determination of evidentiary sufficiency presents a question of law, our standard of review is de novo and our scope of review is plenary. In reviewing the sufficiency of the evidence, we must determine whether the evidence admitted at trial and all reasonable inferences drawn therefrom, viewed in the light most favorable to the Commonwealth as verdict winner, were sufficient to prove every element of the offense beyond a reasonable doubt. The facts and circumstances established by the Commonwealth need not preclude every possibility of innocence. It is within the province of the factfinder to determine the weight to be accorded to each witness's testimony and to believe all, part, or none of the evidence. The Commonwealth may sustain its burden of proving every element of the crime by means of wholly circumstantial evidence. Moreover, as an appellate court, we may not re-weigh the evidence and substitute our judgment for that of the factfinder.

***Commonwealth v. Scott***, 325 A.3d 844, 849 (Pa. Super. 2024) (brackets and citation omitted).

Our Criminal Code permits the use of force to protect oneself under certain circumstances. The self-defense justification, which is codified in section 505, provides that "[t]he use of force upon or toward another person is justifiable when the actor believes that such force is immediately necessary

---

[2] Notably, on appeal, Lee has completely abandoned any justification based on the castle doctrine or defense of property and strictly frames his argument in terms of using deadly force in defense of his person. ***See*** Appellant's Brief, at 7-19.

for the purpose of protecting himself against the use of unlawful force by such other person on the present occasion." 18 Pa.C.S.A. § 505(a). However, section 505 also provides limitations on the use of force, including the use of deadly force. **See** 18 Pa.C.S.A. § 505(b)(2) ("The use of deadly force is not justifiable under this section unless the actor believes that such force is necessary to protect himself against death [or] serious bodily injury[.]"); **see also** 18 Pa.C.S.A. § 501 (defining "deadly force" as "[f]orce which, under the circumstances in which it is used, is readily capable of causing death or serious bodily injury.").

> A self-defense claim thus entails three elements: (1) the defendant reasonably believed that he was in imminent danger of death or serious bodily injury and that it was necessary to use deadly force against the victim to prevent such harm; (2) the defendant was free from fault in provoking the difficulty which culminated in his use of deadly force; and (3) the defendant did not violate any duty to retreat.

**Commonwealth v. Steele**, 234 A.3d 840, 846 (Pa. Super. 2020) (citation omitted). Furthermore,

> [t]he requirement of a reasonable belief encompasses two aspects, one subjective and one objective. First, the defendant "must have acted out of an honest, bona fide belief that he was in imminent danger," which involves consideration of the defendant's subjective state of mind. Second, the defendant's belief that he needed to defend himself with deadly force, if it existed, must be reasonable in light of the facts as they appeared to the defendant, a consideration that involves an objective analysis.

**Commonwealth v. Mouzon**, 53 A.3d 738, 752 (Pa. 2012) (citation omitted).

"A defendant does not have the burden to prove a claim of self-defense. Rather, once the defendant introduces some evidence to justify a finding of self-defense, the issue is properly before the [factfinder,] and the Commonwealth has the burden of disproving the defense beyond a reasonable doubt." *Commonwealth v. Brockington*, 230 A.3d 1209, 1213-14 (Pa. Super. 2020) (citations omitted).

Both the Commonwealth and the trial court maintain that Lee waived his claim of self-defense because he did not raise it at trial. *See* Trial Court Opinion, 11/12/24, at 9; Appellee's Brief, at 8-9. The Commonwealth further contends that because Lee failed to present sufficient evidence to justify a finding of self-defense at trial, the Commonwealth bore no burden to disprove the justification. *See* Appellee's Brief, at 7-9. Accordingly, before we can consider whether the Commonwealth sufficiently disproved Lee's purported self-defense claim beyond a reasonable doubt, we must first determine whether Lee raised the defense at trial.

Lee concedes that at trial, "the defense's argument focused primarily on self-defense in the protection of property," but nonetheless contends that he properly raised self-defense where his testimony established he "had a reasonable belief [] he might be in physical danger because [he] was confronting a man [] he knew owned a firearm and may have been armed during the confrontation." Appellant's Brief, at 12. We disagree.

Here, the factual record does not support Lee's contention that he raised a self-defense justification at trial. Defense counsel's argument centered exclusively on the defense of property justification embodied in section 507, and at no point did counsel suggest Lee's actions were legally justified under section 505 because he acted out of fear of imminent physical harm. *See* N.T. Trial, 12/13/23, at 93-97, 102. In our close review of the record, the only support we could identify to substantiate any contention that Lee explicitly raised a section 505 self-defense justification at trial involved an exchange in which defense counsel clarified to the court that although he "passed both [section] 505 and [section] 507" for the court's consideration, "507 is the more relevant portion than 505." *See* N.T. Trial, 12/13/23, at 99. We cannot conclude this exchange sufficiently raised a section 505 self-defense justification that the Commonwealth was required to disprove.

Moreover, neither Lee's testimony nor the surrounding circumstances suggest he reasonably believed pointing his gun at Faustin and threatening to shoot him was necessary to prevent imminent death or serious bodily injury during the altercation. *See* N.T. Trial, 12/13/23, at 68-69; *see Steele*, 234 A.3d at 846. Throughout his testimony, Lee maintained that he brandished the gun to keep Faustin from entering his home, but at no point did he state he did so because Faustin posed an imminent threat and he believed it was necessary to prevent physical harm. *See* N.T. Trial, 12/13/23, at 87. Rather,

when asked to describe the encounter during direct examination, Lee testified

as follows:

> So he was coming towards my house. You know, he's arguing with me the whole time. I'm like … you're not the landlord or whatever.
>
> I'm like, dude, please, don't come inside of my house. I don't trust you. … [Y]ou haven't notified me. You're here for no reason. You're here arguing with me.
>
> I stood by the door. Right. He got all the way up the steps. … I stood by the front door with the door open, though. I'm, like, you can't come in here. He pushed me to the side and went in there anyway. So that's when I was, like, man why you put your hands on me. You're not supposed to do that.
>
> Now, we're really arguing. Words being exchanged. He leave out. Right. He comes back.
>
> Now, I know [Faustin] for a very long time. He has a gun. I seen it. He has a gun. He comes back. He comes back towards me like this. I don't know if it was a gun or not, though, but I—in my mind, I know that he has a gun. He came back over like this (indicating). And I'm like, dude, back up. I'm like don't come towards me, man. I'm like stay—stay there. Don't come towards me. He like whatever.
>
> I'm, like, dude, I'm licensed to carry. This when I—you know, when he's coming towards me. I'm like, dude, I'm licensed to carry. Don't come towards me.
>
> He, like, so what. I'm, like, matter of fact, I'm going to call the cops if you come towards me. He was, like, I don't care. Call the cops. This is what he said. I don't care. Call the cops.
>
> That's when I was, like, dude, I'm—when he's coming towards, I picked up my phone and I'm like, dude, I will shoot you if you come towards—if you come in this house, basically.
>
> I pulled my gun out. I didn't aim it at him. I took it out of the holster. And I went like this by my side (indicating). He was all the way on the steps part at that time. He was far away from me. I wasn't nowhere near him.

When he comes up closer, this is when I pulled my gun. And I got on the phone, I'm, like, dude, I will blow your—I don't know what I said. I said, I will shoot you. I said I would shoot you.

And then the officer was like, huh, excuse me. What did you say? I'm, like, sorry, ma'am. I'm just … saying that because I'm trying to scare him to get away from me. I don't want him to come in my house. I'm scared right now. I don't know what he's going to do.

That's … what happened.

N.T. Trial, 12/13/23, at 85-87. On cross-examination, Lee testified that he never saw Faustin with a gun on the day in question. **See** N.T. Trial, 12/13/23, at 90-91. Based on this testimony, we cannot conclude Lee's subjective state of mind reflected that of a person who "acted out of an honest, bona fide belief that he was in imminent danger[.]" **Mouzon**, 53 A.3d at 752.

Furthermore, to the extent Lee's testimony on cross-examination suggested he saw the outline of a gun in Faustin's pocket, **see** N.T. Trial, 12/13/23, at 91 ("I never saw him with a gun that day, but it looked like it was, like—I could see, like, outlining in his jacket when he was coming towards me"), the mere fact that Faustin may have owned a gun and potentially had it on his person on the day in question is insufficient to suggest Lee had a reasonable belief Faustin posed a danger necessitating the use of deadly force. **See Commonwealth v. Kennedy**, 332 A.3d 133, 143 (Pa. Super. 2025) (although defendant testified that he feared for his life during the altercation, this Court rejected argument that victim's possession of a gun supported defendant's fear of death or serious bodily injury where there was no

testimony from defendant or anyone else that victim "ever pointed the gun at anyone or otherwise attempted to use the gun"); *see also **Commonwealth v. Vaglica***, 673 A.2d 371, 374 (Pa. Super. 1996) ("To warrant an instruction on justification, the evidence must show, *inter alia*, that the defendant faced a clear and imminent harm not a harm that is debatable or speculative.") (citation omitted).

Therefore, because Lee failed to raise a self-defense claim at trial, the Commonwealth bore no burden to disprove a self-defense justification. Moreover, even if Lee had attempted to argue he was acting in defense of his person at trial, he failed to produce evidence that he had a reasonable belief Faustin posed a danger necessitating the use of deadly force. Accordingly, Lee's challenge to the sufficiency of the evidence is both waived and would lack merit in any event.

Judgment of sentence affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 8/11/2025

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| KYLE T. LEE | : | |
| | : | |
| Appellant | : | No. 1298 EDA 2024 |

Appeal from the Judgment of Sentence Entered February 14, 2024
In the Court of Common Pleas of Philadelphia County Criminal Division at
No(s): CP-51-CR-0008699-2022

BEFORE: PANELLA, P.J.E., DUBOW, J., and BENDER, P.J.E.

MEMORANDUM BY PANELLA, P.J.E.:          **FILED AUGUST 11, 2025**

Kyle T. Lee appeals from the judgment of sentence entered in the Court of Common Pleas of Philadelphia County, after he was convicted of simple assault and recklessly endangering another person ("REAP") at a non-jury trial. Lee challenges the sufficiency of the evidence, alleging the Commonwealth failed to disprove the self-defense justification he raised at trial, pursuant to 18 Pa.C.S.A. § 505. After careful consideration, we affirm.

On November 22, 2022, Lee was involved in an altercation with Widchard Faustin, the property manager of the residence Lee rented in Philadelphia, that culminated in Lee pointing a firearm at Faustin and threatening to shoot him. The trial court comprehensively summarized the evidence presented at trial as follows:

> [Lee] was arrested on November 22, 2022 and charged with aggravated assault [], possession of an instrument of crime [],

terroristic threats [], simple assault [], and [REAP].[1] [The court] held a bench trial on December 13, 2023.

At trial, [the court] heard testimony from the complaining witness, Widchard Faustin; Philadelphia Police Detectives Paul Sanchez and Adam O'Donnell; Philadelphia housing code inspector Anthony Williams and [Lee's] neighbor, Laura Carr, who each testified on [Lee's] behalf; and [Lee] himself. Faustin testified as follows: [Lee] had rented properties from Faustin for about ten years and had occasionally worked for him. On the afternoon of November 22, 2022, Faustin tried to enter the front door of a two-story house at 1114 West Tioga Street in Philadelphia []. According to Faustin, the front door was a common entrance for the house's two residential units; [Lee] lived in the second floor unit. [Lee] blocked Faustin's path by standing on the porch steps, told him that he could not enter, and ran into the house. [Lee] then emerged from the house with a handgun, racked the slide, pointed it at Faustin's head, and threatened to shoot him. Faustin ended the encounter by moving away from the house and calling the police.

Detective Sanchez testified that he executed a warrant for the house, retrieving a handgun and ammunition from a bedroom on the second floor. [Lee's] neighbor and block captain, Laura Carr, testified that she saw the beginning of the altercation between Faustin and [Lee], in which Faustin pushed [Lee] aside and entered the house. She believed that Faustin was the initial aggressor. She also testified that [Lee] had a reputation [for] nonviolence.

[Lee] testified that when he saw Faustin arrive at the house that day, he told him that he could not come in, because "last time he did come in there while I wasn't there, he unplugged everything. All my stuff ... in my refrigerator went bad." [N.T. Trial, 12/13/23, at 85.] He stood next to the open front door, and Faustin pushed him to the side, entered the house, left, and came back. [Lee] believed that Faustin owned a gun, although he did not see it that day and did not know whether Faustin was carrying it. [Lee] unholstered his own gun, which he was licensed to carry, pointed it at Faustin, and threatened to shoot him. [Lee] did not testify that he feared that Faustin would hurt him. (At the trial, [the

_____

1 18 Pa.C.S.A. §§ 2702(a)(1), 907(a), 2706(a)(1), 2701(a), 2705, respectively.

court] observed that Faustin was decades older and significantly smaller and more frail than [Lee].) In a recorded statement that he gave to police that day, [Lee] admitted that he had pointed the gun at Faustin. He did not say in that statement that he had feared that Faustin would harm him.

As set forth above, there was no dispute as to whether [Lee] pointed the gun at Faustin and threatened him; he admitted that he did so. In hot dispute, however, was the question of whether [Lee's] actions were justified under the law. This question centered on whether [Lee] was in possession of the entire house, or only of the second floor, and whether he had the right to exclude Faustin from the first floor. [The court] heard the following evidence on this point[.]

Faustin testified that his niece owned the house, but Faustin was "in charge" of it. [*Id.* at 31]. He also owned a property across the street. Faustin rented the second floor of the two-story structure to [Lee]; the first floor was "an apartment that I kept for my people and that's where my tools are, that's where I stay from time to time." [*Id.* at 18, 30.] Both floors of the house were accessed through the front door. Faustin testified that on the day of the incident, [Lee] told Faustin that he could not come in because "he has taken over the entire property. And I told him, you can't do that, because you live upstairs and I'm not going upstairs. I'm going downstairs to my part." [*Id.* at 19.] According to Faustin, the house was physically divided into two units before [Lee] moved in, with a door with a lock separating the first and second floors. Faustin testified that [Lee] did not have a lease, but that his rent receipts said "apartment upstairs." [*Id.* at 29.] Faustin did not produce these receipts.

Inspector Williams, of Philadelphia's Department of Licenses & Inspections ("L&I"), testified that the owner of the house had been fined seven times for code violations in 2022. On August 8, 2022—more than two months before the incident in this case—an inspector had visited the house and determined that it was in the process of being converted into more than one unit. There were no permits for this work. "As far as [L&I was] concerned," the house was a single-family dwelling. [*Id.* at 64.]

[Lee] testified that he had lived in the house for almost three years before the date of the incident. Initially, he stated, he was permitted to use both floors. One to two years before the incident,

however, Faustin told [Lee] that [Lee] would have to pay more rent if he wished to occupy the first floor. [Lee] refused to pay additional rent. At that point, [Lee] testified, Faustin had workers put up a wall and door that closed off the stairway to the second floor from the rest of the first floor. "He, basically, nailed that up, put a door up, and had me stuck up there" on the second floor. [*Id.* at 75.] Faustin also converted one of the upstairs closets into a makeshift kitchen. [Lee] acknowledged that as of the date of the incident, he was permitted to use the first floor only to access the second floor, not as a living space: "I was only living upstairs at the time because he tried to block me off." [*Id.* at 90.] "Nobody," he said, was using the first floor. [*Id.*]

[Lee] showed two videos of the interior of the house. In the first video, taken before he moved in, there was no barrier between the first floor and the stairway to the second floor. The second was taken years later, before the incident. It showed that a wall and door, with a lock, had been put up to separate the first floor from the second floor. [Lee] also introduced rent receipts from July 2020 and September 2021. The portions of the receipts that are filled out are ambiguous, but appear to indicate that [Lee] was renting "2 Rooms" at "1114 W. Tioga St." [Exhibit D5.] [Lee] testified that when Faustin locked him out of the first floor, [Lee] filed complaints with L&I, sought help from a tenants' rights organization, and began withholding rent. [Lee] did not testify that L&I, the tenants' rights organization, or any other authority told him that he could forcibly exclude Faustin from the house. Indeed, [Lee's] testimony suggested that he understood that Faustin could enter the house under some circumstances. "So, I'm like — and I went to tenant rights. I didn't have to let him inside my house without being present, especially if he's coming over there to work on something because I had to be there." [N.T. Trial, 12/13/23, at 85.]

At the close of the Commonwealth's case, [the court] granted [Lee's] motion for judgment of acquittal on the aggravated assault charge. After [Lee] rested, defense counsel argued that [Lee's] actions were justified defense of his home under 18 Pa. C.S.A. § 507, "Use of force for the protection of property." [*Id.* at 93-97.] Defense counsel also referred to 18 Pa. C.S.A. § 505, "Use of force in self-protection," but conceded that section 507 was "more relevant" to [Lee's] defense. [*Id.* at 99.]

- 4 -

Trial Court Opinion, 11/12/24, at 1-5 (citations to record, brackets, and unnecessary capitalization omitted). Following the close of evidence and argument by counsel, the trial court convicted Lee of simple assault and REAP. On February 14, 2024, the court imposed concurrent one-year sentences of non-reporting probation. That same day, Lee filed a post-sentence motion in arrest of judgment in which he challenged the sufficiency of the evidence offered by the Commonwealth to disprove his defense of property justification. *See* Post-Sentence Motion, 2/14/24, at ¶ 5. On April 12, 2024, the trial court held a hearing on Lee's post-sentence motion, which it denied that same day.

Lee filed a notice of appeal and a court-ordered concise statement of matters complained of on appeal, pursuant to Pa.R.A.P. 1925(b), on May 3, 2024 and June 20, 2024, respectively. On November 12, 2024, the trial court filed its opinion, pursuant to Pa.R.A.P. 1925(a), in which it concluded that Lee's "act of pointing a loaded firearm at another man's head was not a legally justified defense of [his] property" and that Lee did not pursue a self-defense justification at trial. Trial Court Opinion, 11/12/24, at 1, 9.

On appeal, Lee presents the following question for our review:

Was the evidence insufficient to convict Kyle Lee of assault crimes where Lee denied the complainant, the property manager of Lee's rental unit, entry into the property and Lee reasonably believed that the complainant was armed and would turn violent so he brandished his own firearm?

Appellant's Brief, at 2.[2]

Lee presents a challenge to the sufficiency of the evidence to sustain his convictions for simple assault and REAP based on the Commonwealth's alleged failure to disprove his self-defense justification at trial.

> Because a determination of evidentiary sufficiency presents a question of law, our standard of review is de novo and our scope of review is plenary. In reviewing the sufficiency of the evidence, we must determine whether the evidence admitted at trial and all reasonable inferences drawn therefrom, viewed in the light most favorable to the Commonwealth as verdict winner, were sufficient to prove every element of the offense beyond a reasonable doubt. The facts and circumstances established by the Commonwealth need not preclude every possibility of innocence. It is within the province of the factfinder to determine the weight to be accorded to each witness's testimony and to believe all, part, or none of the evidence. The Commonwealth may sustain its burden of proving every element of the crime by means of wholly circumstantial evidence. Moreover, as an appellate court, we may not re-weigh the evidence and substitute our judgment for that of the factfinder.

***Commonwealth v. Scott***, 325 A.3d 844, 849 (Pa. Super. 2024) (brackets and citation omitted).

Our Criminal Code permits the use of force to protect oneself under certain circumstances. The self-defense justification, which is codified in section 505, provides that "[t]he use of force upon or toward another person is justifiable when the actor believes that such force is immediately necessary

_____

[2] Notably, on appeal, Lee has completely abandoned any justification based on the castle doctrine or defense of property and strictly frames his argument in terms of using deadly force in defense of his person. ***See*** Appellant's Brief, at 7-19.

for the purpose of protecting himself against the use of unlawful force by such other person on the present occasion." 18 Pa.C.S.A. § 505(a). However, section 505 also provides limitations on the use of force, including the use of deadly force. **See** 18 Pa.C.S.A. § 505(b)(2) ("The use of deadly force is not justifiable under this section unless the actor believes that such force is necessary to protect himself against death [or] serious bodily injury[.]"); **see also** 18 Pa.C.S.A. § 501 (defining "deadly force" as "[f]orce which, under the circumstances in which it is used, is readily capable of causing death or serious bodily injury.").

> A self-defense claim thus entails three elements: (1) the defendant reasonably believed that he was in imminent danger of death or serious bodily injury and that it was necessary to use deadly force against the victim to prevent such harm; (2) the defendant was free from fault in provoking the difficulty which culminated in his use of deadly force; and (3) the defendant did not violate any duty to retreat.

**Commonwealth v. Steele**, 234 A.3d 840, 846 (Pa. Super. 2020) (citation omitted). Furthermore,

> [t]he requirement of a reasonable belief encompasses two aspects, one subjective and one objective. First, the defendant "must have acted out of an honest, bona fide belief that he was in imminent danger," which involves consideration of the defendant's subjective state of mind. Second, the defendant's belief that he needed to defend himself with deadly force, if it existed, must be reasonable in light of the facts as they appeared to the defendant, a consideration that involves an objective analysis.

**Commonwealth v. Mouzon**, 53 A.3d 738, 752 (Pa. 2012) (citation omitted).

"A defendant does not have the burden to prove a claim of self-defense. Rather, once the defendant introduces some evidence to justify a finding of self-defense, the issue is properly before the [factfinder,] and the Commonwealth has the burden of disproving the defense beyond a reasonable doubt." *Commonwealth v. Brockington*, 230 A.3d 1209, 1213-14 (Pa. Super. 2020) (citations omitted).

Both the Commonwealth and the trial court maintain that Lee waived his claim of self-defense because he did not raise it at trial. *See* Trial Court Opinion, 11/12/24, at 9; Appellee's Brief, at 8-9. The Commonwealth further contends that because Lee failed to present sufficient evidence to justify a finding of self-defense at trial, the Commonwealth bore no burden to disprove the justification. *See* Appellee's Brief, at 7-9. Accordingly, before we can consider whether the Commonwealth sufficiently disproved Lee's purported self-defense claim beyond a reasonable doubt, we must first determine whether Lee raised the defense at trial.

Lee concedes that at trial, "the defense's argument focused primarily on self-defense in the protection of property," but nonetheless contends that he properly raised self-defense where his testimony established he "had a reasonable belief [] he might be in physical danger because [he] was confronting a man [] he knew owned a firearm and may have been armed during the confrontation." Appellant's Brief, at 12. We disagree.

Here, the factual record does not support Lee's contention that he raised a self-defense justification at trial. Defense counsel's argument centered exclusively on the defense of property justification embodied in section 507, and at no point did counsel suggest Lee's actions were legally justified under section 505 because he acted out of fear of imminent physical harm. *See* N.T. Trial, 12/13/23, at 93-97, 102. In our close review of the record, the only support we could identify to substantiate any contention that Lee explicitly raised a section 505 self-defense justification at trial involved an exchange in which defense counsel clarified to the court that although he "passed both [section] 505 and [section] 507" for the court's consideration, "507 is the more relevant portion than 505." *See* N.T. Trial, 12/13/23, at 99. We cannot conclude this exchange sufficiently raised a section 505 self-defense justification that the Commonwealth was required to disprove.

Moreover, neither Lee's testimony nor the surrounding circumstances suggest he reasonably believed pointing his gun at Faustin and threatening to shoot him was necessary to prevent imminent death or serious bodily injury during the altercation. *See* N.T. Trial, 12/13/23, at 68-69; *see Steele*, 234 A.3d at 846. Throughout his testimony, Lee maintained that he brandished the gun to keep Faustin from entering his home, but at no point did he state he did so because Faustin posed an imminent threat and he believed it was necessary to prevent physical harm. *See* N.T. Trial, 12/13/23, at 87. Rather,

when asked to describe the encounter during direct examination, Lee testified

as follows:

> So he was coming towards my house. You know, he's arguing with me the whole time. I'm like … you're not the landlord or whatever.
>
> I'm like, dude, please, don't come inside of my house. I don't trust you. … [Y]ou haven't notified me. You're here for no reason. You're here arguing with me.
>
> I stood by the door. Right. He got all the way up the steps. … I stood by the front door with the door open, though. I'm, like, you can't come in here. He pushed me to the side and went in there anyway. So that's when I was, like, man why you put your hands on me. You're not supposed to do that.
>
> Now, we're really arguing. Words being exchanged. He leave out. Right. He comes back.
>
> Now, I know [Faustin] for a very long time. He has a gun. I seen it. He has a gun. He comes back. He comes back towards me like this. I don't know if it was a gun or not, though, but I—in my mind, I know that he has a gun. He came back over like this (indicating). And I'm like, dude, back up. I'm like don't come towards me, man. I'm like stay—stay there. Don't come towards me. He like whatever.
>
> I'm, like, dude, I'm licensed to carry. This when I—you know, when he's coming towards me. I'm like, dude, I'm licensed to carry. Don't come towards me.
>
> He, like, so what. I'm, like, matter of fact, I'm going to call the cops if you come towards me. He was, like, I don't care. Call the cops. This is what he said. I don't care. Call the cops.
>
> That's when I was, like, dude, I'm—when he's coming towards, I picked up my phone and I'm like, dude, I will shoot you if you come towards—if you come in this house, basically.
>
> I pulled my gun out. I didn't aim it at him. I took it out of the holster. And I went like this by my side (indicating). He was all the way on the steps part at that time. He was far away from me. I wasn't nowhere near him.

When he comes up closer, this is when I pulled my gun. And I got on the phone, I'm, like, dude, I will blow your—I don't know what I said. I said, I will shoot you. I said I would shoot you.

And then the officer was like, huh, excuse me. What did you say? I'm, like, sorry, ma'am. I'm just … saying that because I'm trying to scare him to get away from me. I don't want him to come in my house. I'm scared right now. I don't know what he's going to do.

That's … what happened.

N.T. Trial, 12/13/23, at 85-87. On cross-examination, Lee testified that he never saw Faustin with a gun on the day in question. *See* N.T. Trial, 12/13/23, at 90-91. Based on this testimony, we cannot conclude Lee's subjective state of mind reflected that of a person who "acted out of an honest, bona fide belief that he was in imminent danger[.]" *Mouzon*, 53 A.3d at 752.

Furthermore, to the extent Lee's testimony on cross-examination suggested he saw the outline of a gun in Faustin's pocket, *see* N.T. Trial, 12/13/23, at 91 ("I never saw him with a gun that day, but it looked like it was, like—I could see, like, outlining in his jacket when he was coming towards me"), the mere fact that Faustin may have owned a gun and potentially had it on his person on the day in question is insufficient to suggest Lee had a reasonable belief Faustin posed a danger necessitating the use of deadly force. *See Commonwealth v. Kennedy*, 332 A.3d 133, 143 (Pa. Super. 2025) (although defendant testified that he feared for his life during the altercation, this Court rejected argument that victim's possession of a gun supported defendant's fear of death or serious bodily injury where there was no

testimony from defendant or anyone else that victim "ever pointed the gun at anyone or otherwise attempted to use the gun"); *see also **Commonwealth v. Vaglica***, 673 A.2d 371, 374 (Pa. Super. 1996) ("To warrant an instruction on justification, the evidence must show, *inter alia*, that the defendant faced a clear and imminent harm not a harm that is debatable or speculative.") (citation omitted).

Therefore, because Lee failed to raise a self-defense claim at trial, the Commonwealth bore no burden to disprove a self-defense justification. Moreover, even if Lee had attempted to argue he was acting in defense of his person at trial, he failed to produce evidence that he had a reasonable belief Faustin posed a danger necessitating the use of deadly force. Accordingly, Lee's challenge to the sufficiency of the evidence is both waived and would lack merit in any event.

Judgment of sentence affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 8/11/2025

- 12 -

J-S25001-25

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| KYLE T. LEE | : | |
| | : | |
| Appellant | : | No. 1298 EDA 2024 |

Appeal from the Judgment of Sentence Entered February 14, 2024
In the Court of Common Pleas of Philadelphia County Criminal Division at
No(s):  CP-51-CR-0008699-2022

BEFORE:  PANELLA, P.J.E., DUBOW, J., and BENDER, P.J.E.

MEMORANDUM BY PANELLA, P.J.E.:          **FILED AUGUST 11, 2025**

Kyle T. Lee appeals from the judgment of sentence entered in the Court of Common Pleas of Philadelphia County, after he was convicted of simple assault and recklessly endangering another person ("REAP") at a non-jury trial. Lee challenges the sufficiency of the evidence, alleging the Commonwealth failed to disprove the self-defense justification he raised at trial, pursuant to 18 Pa.C.S.A. § 505. After careful consideration, we affirm.

On November 22, 2022, Lee was involved in an altercation with Widchard Faustin, the property manager of the residence Lee rented in Philadelphia, that culminated in Lee pointing a firearm at Faustin and threatening to shoot him. The trial court comprehensively summarized the evidence presented at trial as follows:

> [Lee] was arrested on November 22, 2022 and charged with aggravated assault [], possession of an instrument of crime [],

terroristic threats [], simple assault [], and [REAP].[1] [The court] held a bench trial on December 13, 2023.

At trial, [the court] heard testimony from the complaining witness, Widchard Faustin; Philadelphia Police Detectives Paul Sanchez and Adam O'Donnell; Philadelphia housing code inspector Anthony Williams and [Lee's] neighbor, Laura Carr, who each testified on [Lee's] behalf; and [Lee] himself. Faustin testified as follows: [Lee] had rented properties from Faustin for about ten years and had occasionally worked for him. On the afternoon of November 22, 2022, Faustin tried to enter the front door of a two-story house at 1114 West Tioga Street in Philadelphia []. According to Faustin, the front door was a common entrance for the house's two residential units; [Lee] lived in the second floor unit. [Lee] blocked Faustin's path by standing on the porch steps, told him that he could not enter, and ran into the house. [Lee] then emerged from the house with a handgun, racked the slide, pointed it at Faustin's head, and threatened to shoot him. Faustin ended the encounter by moving away from the house and calling the police.

Detective Sanchez testified that he executed a warrant for the house, retrieving a handgun and ammunition from a bedroom on the second floor. [Lee's] neighbor and block captain, Laura Carr, testified that she saw the beginning of the altercation between Faustin and [Lee], in which Faustin pushed [Lee] aside and entered the house. She believed that Faustin was the initial aggressor. She also testified that [Lee] had a reputation [for] nonviolence.

[Lee] testified that when he saw Faustin arrive at the house that day, he told him that he could not come in, because "last time he did come in there while I wasn't there, he unplugged everything. All my stuff ... in my refrigerator went bad." [N.T. Trial, 12/13/23, at 85.] He stood next to the open front door, and Faustin pushed him to the side, entered the house, left, and came back. [Lee] believed that Faustin owned a gun, although he did not see it that day and did not know whether Faustin was carrying it. [Lee] unholstered his own gun, which he was licensed to carry, pointed it at Faustin, and threatened to shoot him. [Lee] did not testify that he feared that Faustin would hurt him. (At the trial, [the

_____

1 18 Pa.C.S.A. §§ 2702(a)(1), 907(a), 2706(a)(1), 2701(a), 2705, respectively.

court] observed that Faustin was decades older and significantly smaller and more frail than [Lee].) In a recorded statement that he gave to police that day, [Lee] admitted that he had pointed the gun at Faustin. He did not say in that statement that he had feared that Faustin would harm him.

As set forth above, there was no dispute as to whether [Lee] pointed the gun at Faustin and threatened him; he admitted that he did so. In hot dispute, however, was the question of whether [Lee's] actions were justified under the law. This question centered on whether [Lee] was in possession of the entire house, or only of the second floor, and whether he had the right to exclude Faustin from the first floor. [The court] heard the following evidence on this point[.]

Faustin testified that his niece owned the house, but Faustin was "in charge" of it. [*Id.* at 31]. He also owned a property across the street. Faustin rented the second floor of the two-story structure to [Lee]; the first floor was "an apartment that I kept for my people and that's where my tools are, that's where I stay from time to time." [*Id.* at 18, 30.] Both floors of the house were accessed through the front door. Faustin testified that on the day of the incident, [Lee] told Faustin that he could not come in because "he has taken over the entire property. And I told him, you can't do that, because you live upstairs and I'm not going upstairs. I'm going downstairs to my part." [*Id.* at 19.] According to Faustin, the house was physically divided into two units before [Lee] moved in, with a door with a lock separating the first and second floors. Faustin testified that [Lee] did not have a lease, but that his rent receipts said "apartment upstairs." [*Id.* at 29.] Faustin did not produce these receipts.

Inspector Williams, of Philadelphia's Department of Licenses & Inspections ("L&I"), testified that the owner of the house had been fined seven times for code violations in 2022. On August 8, 2022—more than two months before the incident in this case—an inspector had visited the house and determined that it was in the process of being converted into more than one unit. There were no permits for this work. "As far as [L&I was] concerned," the house was a single-family dwelling. [*Id.* at 64.]

[Lee] testified that he had lived in the house for almost three years before the date of the incident. Initially, he stated, he was permitted to use both floors. One to two years before the incident,

however, Faustin told [Lee] that [Lee] would have to pay more rent if he wished to occupy the first floor. [Lee] refused to pay additional rent. At that point, [Lee] testified, Faustin had workers put up a wall and door that closed off the stairway to the second floor from the rest of the first floor. "He, basically, nailed that up, put a door up, and had me stuck up there" on the second floor. [*Id.* at 75.] Faustin also converted one of the upstairs closets into a makeshift kitchen. [Lee] acknowledged that as of the date of the incident, he was permitted to use the first floor only to access the second floor, not as a living space: "I was only living upstairs at the time because he tried to block me off." [*Id.* at 90.] "Nobody," he said, was using the first floor. [*Id.*]

[Lee] showed two videos of the interior of the house. In the first video, taken before he moved in, there was no barrier between the first floor and the stairway to the second floor. The second was taken years later, before the incident. It showed that a wall and door, with a lock, had been put up to separate the first floor from the second floor. [Lee] also introduced rent receipts from July 2020 and September 2021. The portions of the receipts that are filled out are ambiguous, but appear to indicate that [Lee] was renting "2 Rooms" at "1114 W. Tioga St." [Exhibit D5.] [Lee] testified that when Faustin locked him out of the first floor, [Lee] filed complaints with L&I, sought help from a tenants' rights organization, and began withholding rent. [Lee] did not testify that L&I, the tenants' rights organization, or any other authority told him that he could forcibly exclude Faustin from the house. Indeed, [Lee's] testimony suggested that he understood that Faustin could enter the house under some circumstances. "So, I'm like — and I went to tenant rights. I didn't have to let him inside my house without being present, especially if he's coming over there to work on something because I had to be there." [N.T. Trial, 12/13/23, at 85.]

At the close of the Commonwealth's case, [the court] granted [Lee's] motion for judgment of acquittal on the aggravated assault charge. After [Lee] rested, defense counsel argued that [Lee's] actions were justified defense of his home under 18 Pa. C.S.A. § 507, "Use of force for the protection of property." [*Id.* at 93-97.] Defense counsel also referred to 18 Pa. C.S.A. § 505, "Use of force in self-protection," but conceded that section 507 was "more relevant" to [Lee's] defense. [*Id.* at 99.]

Trial Court Opinion, 11/12/24, at 1-5 (citations to record, brackets, and unnecessary capitalization omitted). Following the close of evidence and argument by counsel, the trial court convicted Lee of simple assault and REAP. On February 14, 2024, the court imposed concurrent one-year sentences of non-reporting probation. That same day, Lee filed a post-sentence motion in arrest of judgment in which he challenged the sufficiency of the evidence offered by the Commonwealth to disprove his defense of property justification. *See* Post-Sentence Motion, 2/14/24, at ¶ 5. On April 12, 2024, the trial court held a hearing on Lee's post-sentence motion, which it denied that same day.

Lee filed a notice of appeal and a court-ordered concise statement of matters complained of on appeal, pursuant to Pa.R.A.P. 1925(b), on May 3, 2024 and June 20, 2024, respectively. On November 12, 2024, the trial court filed its opinion, pursuant to Pa.R.A.P. 1925(a), in which it concluded that Lee's "act of pointing a loaded firearm at another man's head was not a legally justified defense of [his] property" and that Lee did not pursue a self-defense justification at trial. Trial Court Opinion, 11/12/24, at 1, 9.

On appeal, Lee presents the following question for our review:

Was the evidence insufficient to convict Kyle Lee of assault crimes where Lee denied the complainant, the property manager of Lee's rental unit, entry into the property and Lee reasonably believed that the complainant was armed and would turn violent so he brandished his own firearm?

Appellant's Brief, at 2.[2]

Lee presents a challenge to the sufficiency of the evidence to sustain his convictions for simple assault and REAP based on the Commonwealth's alleged failure to disprove his self-defense justification at trial.

> Because a determination of evidentiary sufficiency presents a question of law, our standard of review is de novo and our scope of review is plenary. In reviewing the sufficiency of the evidence, we must determine whether the evidence admitted at trial and all reasonable inferences drawn therefrom, viewed in the light most favorable to the Commonwealth as verdict winner, were sufficient to prove every element of the offense beyond a reasonable doubt. The facts and circumstances established by the Commonwealth need not preclude every possibility of innocence. It is within the province of the factfinder to determine the weight to be accorded to each witness's testimony and to believe all, part, or none of the evidence. The Commonwealth may sustain its burden of proving every element of the crime by means of wholly circumstantial evidence. Moreover, as an appellate court, we may not re-weigh the evidence and substitute our judgment for that of the factfinder.

***Commonwealth v. Scott***, 325 A.3d 844, 849 (Pa. Super. 2024) (brackets and citation omitted).

Our Criminal Code permits the use of force to protect oneself under certain circumstances. The self-defense justification, which is codified in section 505, provides that "[t]he use of force upon or toward another person is justifiable when the actor believes that such force is immediately necessary

---

[2] Notably, on appeal, Lee has completely abandoned any justification based on the castle doctrine or defense of property and strictly frames his argument in terms of using deadly force in defense of his person. ***See*** Appellant's Brief, at 7-19.

for the purpose of protecting himself against the use of unlawful force by such other person on the present occasion." 18 Pa.C.S.A. § 505(a). However, section 505 also provides limitations on the use of force, including the use of deadly force. **See** 18 Pa.C.S.A. § 505(b)(2) ("The use of deadly force is not justifiable under this section unless the actor believes that such force is necessary to protect himself against death [or] serious bodily injury[.]"); **see also** 18 Pa.C.S.A. § 501 (defining "deadly force" as "[f]orce which, under the circumstances in which it is used, is readily capable of causing death or serious bodily injury.").

> A self-defense claim thus entails three elements: (1) the defendant reasonably believed that he was in imminent danger of death or serious bodily injury and that it was necessary to use deadly force against the victim to prevent such harm; (2) the defendant was free from fault in provoking the difficulty which culminated in his use of deadly force; and (3) the defendant did not violate any duty to retreat.

**Commonwealth v. Steele**, 234 A.3d 840, 846 (Pa. Super. 2020) (citation omitted). Furthermore,

> [t]he requirement of a reasonable belief encompasses two aspects, one subjective and one objective. First, the defendant "must have acted out of an honest, bona fide belief that he was in imminent danger," which involves consideration of the defendant's subjective state of mind. Second, the defendant's belief that he needed to defend himself with deadly force, if it existed, must be reasonable in light of the facts as they appeared to the defendant, a consideration that involves an objective analysis.

**Commonwealth v. Mouzon**, 53 A.3d 738, 752 (Pa. 2012) (citation omitted).

- 7 -

"A defendant does not have the burden to prove a claim of self-defense. Rather, once the defendant introduces some evidence to justify a finding of self-defense, the issue is properly before the [factfinder,] and the Commonwealth has the burden of disproving the defense beyond a reasonable doubt." *Commonwealth v. Brockington*, 230 A.3d 1209, 1213-14 (Pa. Super. 2020) (citations omitted).

Both the Commonwealth and the trial court maintain that Lee waived his claim of self-defense because he did not raise it at trial. *See* Trial Court Opinion, 11/12/24, at 9; Appellee's Brief, at 8-9. The Commonwealth further contends that because Lee failed to present sufficient evidence to justify a finding of self-defense at trial, the Commonwealth bore no burden to disprove the justification. *See* Appellee's Brief, at 7-9. Accordingly, before we can consider whether the Commonwealth sufficiently disproved Lee's purported self-defense claim beyond a reasonable doubt, we must first determine whether Lee raised the defense at trial.

Lee concedes that at trial, "the defense's argument focused primarily on self-defense in the protection of property," but nonetheless contends that he properly raised self-defense where his testimony established he "had a reasonable belief [] he might be in physical danger because [he] was confronting a man [] he knew owned a firearm and may have been armed during the confrontation." Appellant's Brief, at 12. We disagree.

Here, the factual record does not support Lee's contention that he raised a self-defense justification at trial. Defense counsel's argument centered exclusively on the defense of property justification embodied in section 507, and at no point did counsel suggest Lee's actions were legally justified under section 505 because he acted out of fear of imminent physical harm. ***See*** N.T. Trial, 12/13/23, at 93-97, 102. In our close review of the record, the only support we could identify to substantiate any contention that Lee explicitly raised a section 505 self-defense justification at trial involved an exchange in which defense counsel clarified to the court that although he "passed both [section] 505 and [section] 507" for the court's consideration, "507 is the more relevant portion than 505." ***See*** N.T. Trial, 12/13/23, at 99. We cannot conclude this exchange sufficiently raised a section 505 self-defense justification that the Commonwealth was required to disprove.

Moreover, neither Lee's testimony nor the surrounding circumstances suggest he reasonably believed pointing his gun at Faustin and threatening to shoot him was necessary to prevent imminent death or serious bodily injury during the altercation. ***See*** N.T. Trial, 12/13/23, at 68-69; ***see Steele***, 234 A.3d at 846. Throughout his testimony, Lee maintained that he brandished the gun to keep Faustin from entering his home, but at no point did he state he did so because Faustin posed an imminent threat and he believed it was necessary to prevent physical harm. ***See*** N.T. Trial, 12/13/23, at 87. Rather,

when asked to describe the encounter during direct examination, Lee testified

as follows:

> So he was coming towards my house. You know, he's arguing with me the whole time. I'm like … you're not the landlord or whatever.
>
> I'm like, dude, please, don't come inside of my house. I don't trust you. … [Y]ou haven't notified me. You're here for no reason. You're here arguing with me.
>
> I stood by the door. Right. He got all the way up the steps. … I stood by the front door with the door open, though. I'm, like, you can't come in here. He pushed me to the side and went in there anyway. So that's when I was, like, man why you put your hands on me. You're not supposed to do that.
>
> Now, we're really arguing. Words being exchanged. He leave out. Right. He comes back.
>
> Now, I know [Faustin] for a very long time. He has a gun. I seen it. He has a gun. He comes back. He comes back towards me like this. I don't know if it was a gun or not, though, but I—in my mind, I know that he has a gun. He came back over like this (indicating). And I'm like, dude, back up. I'm like don't come towards me, man. I'm like stay—stay there. Don't come towards me. He like whatever.
>
> I'm, like, dude, I'm licensed to carry. This when I—you know, when he's coming towards me. I'm like, dude, I'm licensed to carry. Don't come towards me.
>
> He, like, so what. I'm, like, matter of fact, I'm going to call the cops if you come towards me. He was, like, I don't care. Call the cops. This is what he said. I don't care. Call the cops.
>
> That's when I was, like, dude, I'm—when he's coming towards, I picked up my phone and I'm like, dude, I will shoot you if you come towards—if you come in this house, basically.
>
> I pulled my gun out. I didn't aim it at him. I took it out of the holster. And I went like this by my side (indicating). He was all the way on the steps part at that time. He was far away from me. I wasn't nowhere near him.

When he comes up closer, this is when I pulled my gun. And I got on the phone, I'm, like, dude, I will blow your—I don't know what I said. I said, I will shoot you. I said I would shoot you.

And then the officer was like, huh, excuse me. What did you say? I'm, like, sorry, ma'am. I'm just … saying that because I'm trying to scare him to get away from me. I don't want him to come in my house. I'm scared right now. I don't know what he's going to do.

That's … what happened.

N.T. Trial, 12/13/23, at 85-87. On cross-examination, Lee testified that he never saw Faustin with a gun on the day in question. **See** N.T. Trial, 12/13/23, at 90-91. Based on this testimony, we cannot conclude Lee's subjective state of mind reflected that of a person who "acted out of an honest, bona fide belief that he was in imminent danger[.]" **Mouzon**, 53 A.3d at 752.

Furthermore, to the extent Lee's testimony on cross-examination suggested he saw the outline of a gun in Faustin's pocket, **see** N.T. Trial, 12/13/23, at 91 ("I never saw him with a gun that day, but it looked like it was, like—I could see, like, outlining in his jacket when he was coming towards me"), the mere fact that Faustin may have owned a gun and potentially had it on his person on the day in question is insufficient to suggest Lee had a reasonable belief Faustin posed a danger necessitating the use of deadly force. **See Commonwealth v. Kennedy**, 332 A.3d 133, 143 (Pa. Super. 2025) (although defendant testified that he feared for his life during the altercation, this Court rejected argument that victim's possession of a gun supported defendant's fear of death or serious bodily injury where there was no

- 11 -

testimony from defendant or anyone else that victim "ever pointed the gun at anyone or otherwise attempted to use the gun"); *see also Commonwealth v. Vaglica*, 673 A.2d 371, 374 (Pa. Super. 1996) ("To warrant an instruction on justification, the evidence must show, *inter alia*, that the defendant faced a clear and imminent harm not a harm that is debatable or speculative.") (citation omitted).

Therefore, because Lee failed to raise a self-defense claim at trial, the Commonwealth bore no burden to disprove a self-defense justification. Moreover, even if Lee had attempted to argue he was acting in defense of his person at trial, he failed to produce evidence that he had a reasonable belief Faustin posed a danger necessitating the use of deadly force. Accordingly, Lee's challenge to the sufficiency of the evidence is both waived and would lack merit in any event.

Judgment of sentence affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 8/11/2025

J-S25001-25

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

COMMONWEALTH OF PENNSYLVANIA : IN THE SUPERIOR COURT OF
                                            :          PENNSYLVANIA
                                            :
              v.                         :
                                            :
                                            :
KYLE T. LEE                          :
                                            :
              Appellant           :     No. 1298 EDA 2024

Appeal from the Judgment of Sentence Entered February 14, 2024
In the Court of Common Pleas of Philadelphia County Criminal Division at
No(s): CP-51-CR-0008699-2022

BEFORE: PANELLA, P.J.E., DUBOW, J., and BENDER, P.J.E.

MEMORANDUM BY PANELLA, P.J.E.:          **FILED AUGUST 11, 2025**

Kyle T. Lee appeals from the judgment of sentence entered in the Court of Common Pleas of Philadelphia County, after he was convicted of simple assault and recklessly endangering another person ("REAP") at a non-jury trial. Lee challenges the sufficiency of the evidence, alleging the Commonwealth failed to disprove the self-defense justification he raised at trial, pursuant to 18 Pa.C.S.A. § 505. After careful consideration, we affirm.

On November 22, 2022, Lee was involved in an altercation with Widchard Faustin, the property manager of the residence Lee rented in Philadelphia, that culminated in Lee pointing a firearm at Faustin and threatening to shoot him. The trial court comprehensively summarized the evidence presented at trial as follows:

> [Lee] was arrested on November 22, 2022 and charged with aggravated assault [], possession of an instrument of crime [],

terroristic threats [], simple assault [], and [REAP].[1] [The court] held a bench trial on December 13, 2023.

At trial, [the court] heard testimony from the complaining witness, Widchard Faustin; Philadelphia Police Detectives Paul Sanchez and Adam O'Donnell; Philadelphia housing code inspector Anthony Williams and [Lee's] neighbor, Laura Carr, who each testified on [Lee's] behalf; and [Lee] himself. Faustin testified as follows: [Lee] had rented properties from Faustin for about ten years and had occasionally worked for him. On the afternoon of November 22, 2022, Faustin tried to enter the front door of a two-story house at 1114 West Tioga Street in Philadelphia []. According to Faustin, the front door was a common entrance for the house's two residential units; [Lee] lived in the second floor unit. [Lee] blocked Faustin's path by standing on the porch steps, told him that he could not enter, and ran into the house. [Lee] then emerged from the house with a handgun, racked the slide, pointed it at Faustin's head, and threatened to shoot him. Faustin ended the encounter by moving away from the house and calling the police.

Detective Sanchez testified that he executed a warrant for the house, retrieving a handgun and ammunition from a bedroom on the second floor. [Lee's] neighbor and block captain, Laura Carr, testified that she saw the beginning of the altercation between Faustin and [Lee], in which Faustin pushed [Lee] aside and entered the house. She believed that Faustin was the initial aggressor. She also testified that [Lee] had a reputation [for] nonviolence.

[Lee] testified that when he saw Faustin arrive at the house that day, he told him that he could not come in, because "last time he did come in there while I wasn't there, he unplugged everything. All my stuff ... in my refrigerator went bad." [N.T. Trial, 12/13/23, at 85.] He stood next to the open front door, and Faustin pushed him to the side, entered the house, left, and came back. [Lee] believed that Faustin owned a gun, although he did not see it that day and did not know whether Faustin was carrying it. [Lee] unholstered his own gun, which he was licensed to carry, pointed it at Faustin, and threatened to shoot him. [Lee] did not testify that he feared that Faustin would hurt him. (At the trial, [the

_____

1 18 Pa.C.S.A. §§ 2702(a)(1), 907(a), 2706(a)(1), 2701(a), 2705, respectively.

court] observed that Faustin was decades older and significantly smaller and more frail than [Lee].) In a recorded statement that he gave to police that day, [Lee] admitted that he had pointed the gun at Faustin. He did not say in that statement that he had feared that Faustin would harm him.

As set forth above, there was no dispute as to whether [Lee] pointed the gun at Faustin and threatened him; he admitted that he did so. In hot dispute, however, was the question of whether [Lee's] actions were justified under the law. This question centered on whether [Lee] was in possession of the entire house, or only of the second floor, and whether he had the right to exclude Faustin from the first floor. [The court] heard the following evidence on this point[.]

Faustin testified that his niece owned the house, but Faustin was "in charge" of it. [*Id.* at 31]. He also owned a property across the street. Faustin rented the second floor of the two-story structure to [Lee]; the first floor was "an apartment that I kept for my people and that's where my tools are, that's where I stay from time to time." [*Id.* at 18, 30.] Both floors of the house were accessed through the front door. Faustin testified that on the day of the incident, [Lee] told Faustin that he could not come in because "he has taken over the entire property. And I told him, you can't do that, because you live upstairs and I'm not going upstairs. I'm going downstairs to my part." [*Id.* at 19.] According to Faustin, the house was physically divided into two units before [Lee] moved in, with a door with a lock separating the first and second floors. Faustin testified that [Lee] did not have a lease, but that his rent receipts said "apartment upstairs." [*Id.* at 29.] Faustin did not produce these receipts.

Inspector Williams, of Philadelphia's Department of Licenses & Inspections ("L&I"), testified that the owner of the house had been fined seven times for code violations in 2022. On August 8, 2022—more than two months before the incident in this case—an inspector had visited the house and determined that it was in the process of being converted into more than one unit. There were no permits for this work. "As far as [L&I was] concerned," the house was a single-family dwelling. [*Id.* at 64.]

[Lee] testified that he had lived in the house for almost three years before the date of the incident. Initially, he stated, he was permitted to use both floors. One to two years before the incident,

however, Faustin told [Lee] that [Lee] would have to pay more rent if he wished to occupy the first floor. [Lee] refused to pay additional rent. At that point, [Lee] testified, Faustin had workers put up a wall and door that closed off the stairway to the second floor from the rest of the first floor. "He, basically, nailed that up, put a door up, and had me stuck up there" on the second floor. [**Id.** at 75.] Faustin also converted one of the upstairs closets into a makeshift kitchen. [Lee] acknowledged that as of the date of the incident, he was permitted to use the first floor only to access the second floor, not as a living space: "I was only living upstairs at the time because he tried to block me off." [**Id.** at 90.] "Nobody," he said, was using the first floor. [**Id.**]

[Lee] showed two videos of the interior of the house. In the first video, taken before he moved in, there was no barrier between the first floor and the stairway to the second floor. The second was taken years later, before the incident. It showed that a wall and door, with a lock, had been put up to separate the first floor from the second floor. [Lee] also introduced rent receipts from July 2020 and September 2021. The portions of the receipts that are filled out are ambiguous, but appear to indicate that [Lee] was renting "2 Rooms" at "1114 W. Tioga St." [Exhibit D5.] [Lee] testified that when Faustin locked him out of the first floor, [Lee] filed complaints with L&I, sought help from a tenants' rights organization, and began withholding rent. [Lee] did not testify that L&I, the tenants' rights organization, or any other authority told him that he could forcibly exclude Faustin from the house. Indeed, [Lee's] testimony suggested that he understood that Faustin could enter the house under some circumstances. "So, I'm like — and I went to tenant rights. I didn't have to let him inside my house without being present, especially if he's coming over there to work on something because I had to be there." [N.T. Trial, 12/13/23, at 85.]

At the close of the Commonwealth's case, [the court] granted [Lee's] motion for judgment of acquittal on the aggravated assault charge. After [Lee] rested, defense counsel argued that [Lee's] actions were justified defense of his home under 18 Pa. C.S.A. § 507, "Use of force for the protection of property." [**Id.** at 93-97.] Defense counsel also referred to 18 Pa. C.S.A. § 505, "Use of force in self-protection," but conceded that section 507 was "more relevant" to [Lee's] defense. [**Id.** at 99.]

- 4 -

Trial Court Opinion, 11/12/24, at 1-5 (citations to record, brackets, and unnecessary capitalization omitted). Following the close of evidence and argument by counsel, the trial court convicted Lee of simple assault and REAP. On February 14, 2024, the court imposed concurrent one-year sentences of non-reporting probation. That same day, Lee filed a post-sentence motion in arrest of judgment in which he challenged the sufficiency of the evidence offered by the Commonwealth to disprove his defense of property justification. *See* Post-Sentence Motion, 2/14/24, at ¶ 5. On April 12, 2024, the trial court held a hearing on Lee's post-sentence motion, which it denied that same day.

Lee filed a notice of appeal and a court-ordered concise statement of matters complained of on appeal, pursuant to Pa.R.A.P. 1925(b), on May 3, 2024 and June 20, 2024, respectively. On November 12, 2024, the trial court filed its opinion, pursuant to Pa.R.A.P. 1925(a), in which it concluded that Lee's "act of pointing a loaded firearm at another man's head was not a legally justified defense of [his] property" and that Lee did not pursue a self-defense justification at trial. Trial Court Opinion, 11/12/24, at 1, 9.

On appeal, Lee presents the following question for our review:

Was the evidence insufficient to convict Kyle Lee of assault crimes where Lee denied the complainant, the property manager of Lee's rental unit, entry into the property and Lee reasonably believed that the complainant was armed and would turn violent so he brandished his own firearm?

Appellant's Brief, at 2.[2]

Lee presents a challenge to the sufficiency of the evidence to sustain his convictions for simple assault and REAP based on the Commonwealth's alleged failure to disprove his self-defense justification at trial.

> Because a determination of evidentiary sufficiency presents a question of law, our standard of review is de novo and our scope of review is plenary. In reviewing the sufficiency of the evidence, we must determine whether the evidence admitted at trial and all reasonable inferences drawn therefrom, viewed in the light most favorable to the Commonwealth as verdict winner, were sufficient to prove every element of the offense beyond a reasonable doubt. The facts and circumstances established by the Commonwealth need not preclude every possibility of innocence. It is within the province of the factfinder to determine the weight to be accorded to each witness's testimony and to believe all, part, or none of the evidence. The Commonwealth may sustain its burden of proving every element of the crime by means of wholly circumstantial evidence. Moreover, as an appellate court, we may not re-weigh the evidence and substitute our judgment for that of the factfinder.

***Commonwealth v. Scott***, 325 A.3d 844, 849 (Pa. Super. 2024) (brackets and citation omitted).

Our Criminal Code permits the use of force to protect oneself under certain circumstances. The self-defense justification, which is codified in section 505, provides that "[t]he use of force upon or toward another person is justifiable when the actor believes that such force is immediately necessary

---

[2] Notably, on appeal, Lee has completely abandoned any justification based on the castle doctrine or defense of property and strictly frames his argument in terms of using deadly force in defense of his person. ***See*** Appellant's Brief, at 7-19.

for the purpose of protecting himself against the use of unlawful force by such other person on the present occasion." 18 Pa.C.S.A. § 505(a). However, section 505 also provides limitations on the use of force, including the use of deadly force. **See** 18 Pa.C.S.A. § 505(b)(2) ("The use of deadly force is not justifiable under this section unless the actor believes that such force is necessary to protect himself against death [or] serious bodily injury[.]"); **see also** 18 Pa.C.S.A. § 501 (defining "deadly force" as "[f]orce which, under the circumstances in which it is used, is readily capable of causing death or serious bodily injury.").

> A self-defense claim thus entails three elements: (1) the defendant reasonably believed that he was in imminent danger of death or serious bodily injury and that it was necessary to use deadly force against the victim to prevent such harm; (2) the defendant was free from fault in provoking the difficulty which culminated in his use of deadly force; and (3) the defendant did not violate any duty to retreat.

**Commonwealth v. Steele**, 234 A.3d 840, 846 (Pa. Super. 2020) (citation omitted). Furthermore,

> [t]he requirement of a reasonable belief encompasses two aspects, one subjective and one objective. First, the defendant "must have acted out of an honest, bona fide belief that he was in imminent danger," which involves consideration of the defendant's subjective state of mind. Second, the defendant's belief that he needed to defend himself with deadly force, if it existed, must be reasonable in light of the facts as they appeared to the defendant, a consideration that involves an objective analysis.

**Commonwealth v. Mouzon**, 53 A.3d 738, 752 (Pa. 2012) (citation omitted).

"A defendant does not have the burden to prove a claim of self-defense. Rather, once the defendant introduces some evidence to justify a finding of self-defense, the issue is properly before the [factfinder,] and the Commonwealth has the burden of disproving the defense beyond a reasonable doubt." *Commonwealth v. Brockington*, 230 A.3d 1209, 1213-14 (Pa. Super. 2020) (citations omitted).

Both the Commonwealth and the trial court maintain that Lee waived his claim of self-defense because he did not raise it at trial. *See* Trial Court Opinion, 11/12/24, at 9; Appellee's Brief, at 8-9. The Commonwealth further contends that because Lee failed to present sufficient evidence to justify a finding of self-defense at trial, the Commonwealth bore no burden to disprove the justification. *See* Appellee's Brief, at 7-9. Accordingly, before we can consider whether the Commonwealth sufficiently disproved Lee's purported self-defense claim beyond a reasonable doubt, we must first determine whether Lee raised the defense at trial.

Lee concedes that at trial, "the defense's argument focused primarily on self-defense in the protection of property," but nonetheless contends that he properly raised self-defense where his testimony established he "had a reasonable belief [] he might be in physical danger because [he] was confronting a man [] he knew owned a firearm and may have been armed during the confrontation." Appellant's Brief, at 12. We disagree.

Here, the factual record does not support Lee's contention that he raised a self-defense justification at trial. Defense counsel's argument centered exclusively on the defense of property justification embodied in section 507, and at no point did counsel suggest Lee's actions were legally justified under section 505 because he acted out of fear of imminent physical harm. **See** N.T. Trial, 12/13/23, at 93-97, 102. In our close review of the record, the only support we could identify to substantiate any contention that Lee explicitly raised a section 505 self-defense justification at trial involved an exchange in which defense counsel clarified to the court that although he "passed both [section] 505 and [section] 507" for the court's consideration, "507 is the more relevant portion than 505." **See** N.T. Trial, 12/13/23, at 99. We cannot conclude this exchange sufficiently raised a section 505 self-defense justification that the Commonwealth was required to disprove.

Moreover, neither Lee's testimony nor the surrounding circumstances suggest he reasonably believed pointing his gun at Faustin and threatening to shoot him was necessary to prevent imminent death or serious bodily injury during the altercation. **See** N.T. Trial, 12/13/23, at 68-69; **see Steele**, 234 A.3d at 846. Throughout his testimony, Lee maintained that he brandished the gun to keep Faustin from entering his home, but at no point did he state he did so because Faustin posed an imminent threat and he believed it was necessary to prevent physical harm. **See** N.T. Trial, 12/13/23, at 87. Rather,

when asked to describe the encounter during direct examination, Lee testified

as follows:

> So he was coming towards my house. You know, he's arguing with me the whole time. I'm like … you're not the landlord or whatever.
>
> I'm like, dude, please, don't come inside of my house. I don't trust you. … [Y]ou haven't notified me. You're here for no reason. You're here arguing with me.
>
> I stood by the door. Right. He got all the way up the steps. … I stood by the front door with the door open, though. I'm, like, you can't come in here. He pushed me to the side and went in there anyway. So that's when I was, like, man why you put your hands on me. You're not supposed to do that.
>
> Now, we're really arguing. Words being exchanged. He leave out. Right. He comes back.
>
> Now, I know [Faustin] for a very long time. He has a gun. I seen it. He has a gun. He comes back. He comes back towards me like this. I don't know if it was a gun or not, though, but I—in my mind, I know that he has a gun. He came back over like this (indicating). And I'm like, dude, back up. I'm like don't come towards me, man. I'm like stay—stay there. Don't come towards me. He like whatever.
>
> I'm, like, dude, I'm licensed to carry. This when I—you know, when he's coming towards me. I'm like, dude, I'm licensed to carry. Don't come towards me.
>
> He, like, so what. I'm, like, matter of fact, I'm going to call the cops if you come towards me. He was, like, I don't care. Call the cops. This is what he said. I don't care. Call the cops.
>
> That's when I was, like, dude, I'm—when he's coming towards, I picked up my phone and I'm like, dude, I will shoot you if you come towards—if you come in this house, basically.
>
> I pulled my gun out. I didn't aim it at him. I took it out of the holster. And I went like this by my side (indicating). He was all the way on the steps part at that time. He was far away from me. I wasn't nowhere near him.

> When he comes up closer, this is when I pulled my gun. And I got on the phone, I'm, like, dude, I will blow your—I don't know what I said. I said, I will shoot you. I said I would shoot you.
>
> And then the officer was like, huh, excuse me. What did you say? I'm, like, sorry, ma'am. I'm just … saying that because I'm trying to scare him to get away from me. I don't want him to come in my house. I'm scared right now. I don't know what he's going to do.
>
> That's … what happened.

N.T. Trial, 12/13/23, at 85-87. On cross-examination, Lee testified that he never saw Faustin with a gun on the day in question. *See* N.T. Trial, 12/13/23, at 90-91. Based on this testimony, we cannot conclude Lee's subjective state of mind reflected that of a person who "acted out of an honest, bona fide belief that he was in imminent danger[.]" ***Mouzon***, 53 A.3d at 752.

Furthermore, to the extent Lee's testimony on cross-examination suggested he saw the outline of a gun in Faustin's pocket, *see* N.T. Trial, 12/13/23, at 91 ("I never saw him with a gun that day, but it looked like it was, like—I could see, like, outlining in his jacket when he was coming towards me"), the mere fact that Faustin may have owned a gun and potentially had it on his person on the day in question is insufficient to suggest Lee had a reasonable belief Faustin posed a danger necessitating the use of deadly force. ***See Commonwealth v. Kennedy***, 332 A.3d 133, 143 (Pa. Super. 2025) (although defendant testified that he feared for his life during the altercation, this Court rejected argument that victim's possession of a gun supported defendant's fear of death or serious bodily injury where there was no

- 11 -

testimony from defendant or anyone else that victim "ever pointed the gun at anyone or otherwise attempted to use the gun"); *see also Commonwealth v. Vaglica*, 673 A.2d 371, 374 (Pa. Super. 1996) ("To warrant an instruction on justification, the evidence must show, *inter alia*, that the defendant faced a clear and imminent harm not a harm that is debatable or speculative.") (citation omitted).

Therefore, because Lee failed to raise a self-defense claim at trial, the Commonwealth bore no burden to disprove a self-defense justification. Moreover, even if Lee had attempted to argue he was acting in defense of his person at trial, he failed to produce evidence that he had a reasonable belief Faustin posed a danger necessitating the use of deadly force. Accordingly, Lee's challenge to the sufficiency of the evidence is both waived and would lack merit in any event.

Judgment of sentence affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 8/11/2025